**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| Stonington Water Street Assoc., LLC,<br>Plaintiff,<br><br>v.<br><br>Hodess Building Co., Inc., and National Fire Ins. Co.,<br>Defendants. | No. 3:08cv1359 (SRU) |

**RULING ON MOTION FOR SUMMARY JUDGMENT**

On May 28, 2003, plaintiff Stonington Water Street Assoc., LLC ("Stonington") entered into a contract with Hodess Building Company, Inc. ("Hodess") for the construction of a condominium complex ("the project") on Water Street in Stonington, Connecticut. The project had a contract cost $20,095,100 and a substantial completion date of November 22, 2004. National Fire Insurance Company of Hartford ("National Fire") executed an American Institute of Architects ("AIA") A-312 performance surety bond on behalf of Hodess for the project. The project experienced a number of delays and Hodess suffered from a financial inability to complete the project and pay its subcontractors. In November 2006, Stonington notified National Fire that Hodess had defaulted on the construction contract. Stonington then sought to invoke coverage under the performance bond and demand that National Fire undertake and complete Hodess's remaining obligations under the construction contract. National Fire denied coverage on the grounds that Stonington failed to comply with the performance bond's terms and, even if Stonington had complied, the claims filed were for damages not recoverable under the terms of the performance bond.

In September 2008, Stonington filed this suit against Hodess and National Fire.[1] Hodess has not appeared. The nine-count complaint (doc. # 1) alleges that National Fire has failed to perform under the terms of the performance bond, failed to reimburse under the terms of the bond, breached the implied covenant of good faith and fair dealing, and violated the Connecticut Unfair Insurance Practices Act ("CUIPA"), and the Connecticut Unfair Trade Practices Act ("CUTPA").

On March 5, 2010, National Fire moved for summary judgment on each of Stonington's claims against it.[2] (Doc. # 27). National Fire argues that Stonington's hiring of replacement contractors and failure to comply with the terms of the construction contract and the performance bond's conditions precedent has rendered the bond null and void, thereby excusing National Fire's performance under the bond.

Case law in Connecticut and the Second Circuit favors strict compliance with a surety bond's terms, and the record at summary judgment, including Stonington's July 26, 2010 letter, demonstrates that Stonington has failed, in a number of ways, to comply with the terms of the construction contract and the performance bond's conditions precedent. Those failures by Stonington have prejudiced National Fire, thereby discharging National Fire's obligations to perform under the bond. Accordingly, summary judgment is granted in favor of National Fire.

---

[1] Stonington and Hodess are co-defendants in a separate action brought in the Connecticut Superior Court involving the condominium owners' associations concerning claims of defective workmanship. That suit is still pending.

[2] National Fire also disputes the nature and extent of damages alleged by Stonington, but its motion for summary judgment is limited to the question of liability.

## I. Standard of Review

Summary judgment is appropriate when the evidence demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d. 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of its pleadings, but must present significant probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247-48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if it can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

The Second Circuit has articulated a more specific standard applicable in contract actions. "In determining a motion for summary judgment involving the construction of contractual language, a court should accord that language its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish. Where contractual language is ambiguous and subject to varying reasonable interpretations, intent becomes an issue of fact and summary judgment is inappropriate. The mere assertion of an ambiguity does not suffice to make an issue of fact. Ambiguity resides in a

writing when – after it is viewed objectively – more than one meaning may reasonably be ascribed to the language used. Only where the language is unambiguous may the district court construe it as a matter of law and grant summary judgment accordingly." *Palmieri v. Allstate Ins. Co.,* 445 F.3d 179, 187 (2d Cir. 2006) (quoting *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990)).

## II. Background

### *A. The Relevant Documents*

#### 1. The Performance Bond

The AIA 312 performance bond is an American Institute of Architects standard document ("AIA 312"). Doc. # 1, ex. B (Bond. No. 929273517). Under the bond's terms, National Fire is the Surety, Hodess is the Contractor and Stonington is the Owner. The terms most relevant to this motion appear in sections 3 through 6. Section 3 sets forth the steps the Owner must take in order to invoke the Surety's obligation to perform in the event of a contractor default. Section 4 details the obligations of the Surety once the Owner has satisfied the conditions of section 3. Section 5 lays out the remedies available to the Owner if the Surety fails to perform. Section 6 describes the nature of damages payable by the Surety in the event the Contractor fails to perform. A contractor default is defined as a "failure of the contractor, which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the construction contract."

#### 2. The Construction Contract

The performance bond incorporates the terms and conditions of the construction contract. Doc. # 1, ex. B. The construction contract is a two-part document. Doc. # 1, ex. A at 3-76. The

first part is an AIA form 121 standard agreement between Owner and Contractor ("AIA 121"). Doc. # 1, ex. A at 3-28. It sets forth, in basic terms, the relationship and obligations of the parties. Article 8 specifies the various insurances required, with section 8.3 addressing the performance bond. Article 10 concerns termination of the contract.

The second part of the construction contract is the AIA A201, which sets forth general conditions of the contract for construction ("AIA A201"). Doc. # 1, ex. A at 29-76. The relevant provisions are Article 4 (administration of the contract); Article 9 (final completion and payment); Article 12 (uncovering and correction of work); and Article 14 (termination), notably sections 14.2-14.2.1. Termination after the setting of the guaranteed maximum price can be accomplished only as set forth in Article 14 of the AIA A201.

*B. Factual Background*

Resolving all ambiguities and drawing all inferences in favor of the nonmoving party, here Stonington, the facts concerning whether Stonington complied with the bond's conditions precedent are as follows. On May 28, 2003, Stonington entered into a contract with Hodess for the construction of a condominium complex on Water Street in Stonington, Connecticut at a cost of $20,095,100 and substantial completion date of November 22, 2004. National Fire, as surety, executed the AIA 312 performance bond in favor of Hodess. Doc. # 1, ex. B. The bond is an industry standard document and principally sets forth that, in the event Hodess, the contractor, defaults on the underlying construction contract with Stonington, National Fire will assume the responsibilities of the contractor to correct defective work, and, if necessary, complete the project. *Id.* Here the controlling construction contract is between Stonington and Hodess, which consists of both the AIA 121 and the AIA A201. The construction contract provides, in pertinent

part, for the redevelopment of a factory building into twenty-nine condominiums, five townhomes and commercial space; the construction contract sets the terms and conditions of the project.

The project experienced a number of difficulties including three delays and Hodess's financial inability to complete the project and pay its subcontractors. The first delay occurred shortly after construction began in July 2003. A fire broke out at the construction site on July 3, 2003, causing heavy damage to a granite industrial building. Stonington alleges that the fire was caused by Hodess. The fire delayed the project's completion at a loss of $2.4 million to Stonington. With respect to the damage, Stonington's own "builders risk" policy only covered an unspecified portion of the loss. *See* doc. # 35, p. 4 n.3. A second delay of one and half months occurred during an unspecified time period as a result of Hodess's use of defective windows. The third delay, caused by a burst sprinkler line, occurred in February 2006 and lasted for one month.

In early 2005, National Fire, Hodess and Stonington met to discuss Hodess's deteriorating financial condition. Another meeting took place on May 17, 2005. Laurence Jortner, National Fire's senior surety claims counsel, attended the May 17, 2005 meeting by phone and Dennis Hammond, National Fire's engineer, and Charles Grove, a consultant for National Fire, attended the meeting in person. Stonington's counsel, John Tesei, also attended the meeting. At that time, National Fire informed Stonington that National Fire had learned that Hodess suffered financial shortfalls on other projects and had left them incomplete. National Fire contends that it took the position at the meeting that it would no longer back Hodess on the project. Stonington disputes that assertion. Nevertheless, Hodess continued to work on the project.

On March 13, 2006, Stonington sent a letter to National Fire notifying National Fire that Stonington was considering declaring a default against Hodess and requesting a meeting pursuant to section 3.1 of the bond. *See* doc. # 31, ex. A; doc. # 1, ex. B. On March 31, 2006, Hodess, Stonington and National Fire met again to discuss the status of the project. At that time, Hodess informed the parties that it did not have the necessary funds to complete the project. Hammond and Bradford Carver, National Fire's counsel, attended the March 31, 2006 meeting. National Fire asserts that Stonington recognized the need to terminate Hodess but opted, against National Fire's advice, to keep Hodess staff on the project so as not to disrupt the already-delayed job. Stonington disputes that it sought to terminate Hodess at that time, but concedes that Stonington decided against declaring a contractor default in Spring 2006 and opted to keep Hodess on site as long as possible.

On April 17, 2006, National Fire contacted Stonington by letter and requested an accounting of Hodess's financial records including remaining contract balances, disbursements, pending claims and offsets. *See* doc. # 31, ex. B. The request was renewed via letter on April 28, 2006. *Id.* at ex. C. Four months later, in August 2006, Hodess ceased working on the project, and Stonington hired three former Hodess employees to complete the project.

On November 2, 2006, two months after Hodess ceased its involvement in the project and seven months after the section 3.1 meeting, Stonington notified National Fire that Stonington was terminating Hodess's right to complete the contract and that Stonington was declaring a contractor default pursuant to section 3.2 of the bond. *See* doc. # 31, ex. D. In the November 2, 2006 letter declaring the default, Stonington cited Hodess's breach of contract for failure to perform in a timely manner, breach of contract for negligence, breach of contract for faulty

waterproofing of the units, and breach of contract for leaky showers as grounds for contract termination. On November 9, 2006, Stonington notified National Fire that, as surety, it was responsible for completing Hodess's contractual obligations, namely warranty work and any additional expenses incurred by Stonington arising out of Hodess's default and delays.

National Fire responded to Stonington's notice of termination and default by letter dated November 16, 2006. National Fire stated that strict compliance with the bond's terms was necessary and that coverage under the bond would be denied because Stonington failed to comply with the requisite steps for invoking the provisions of section 3 of the surety bond. *See* doc. # 31, ex. F. National Fire also stated that, because the project was substantially completed, Stonington was barred from declaring a default and invoking coverage under the bond. *Id.* National Fire further requested that Stonington provide a contract accounting and a commitment that Stonington would pay the contract price per section 3.3 of the bond agreement. Nothing in the record indicates that Stonington complied with the request.[3]

A meeting was held at the project site in December 2006 at which time National Fire claims to have requested that Stonington provide National Fire with the outstanding contract balances, the status of the Project, including the punch list (list of warranty work) and the specifics of Stonington's claim against the bond. Stonington disputes the nature of National Fire's December 2006 request. In an April 2, 2007, letter Stonington renewed its claim for coverage under the bond and stated that it suffered at least $13,000,000 in damages as a result of

[3] At oral argument Stonington was asked to submit evidence, if available, that it had complied with section 3.3 of the bond. Stonington subsequently submitted a number of correspondences between it and National Fire – none of which comply with section 3.3. Stonington, however, did state in its July 26, 2010 communication to the court that it has conveyed to National Fire that it would pay the contract balance. Doc. # 48 at 2.

Hodess's non-performance, negligent performance and delayed performance. Stonington renewed its demand for National Fire's performance under the terms of the bond. *See* doc. # 31, ex. G. National Fire responded by letter dated April 4, 2007. In that letter, National Fire restated its request for an accounting in order to determine the contract balance and what amount Stonington had expended in completing work on the project. National Fire also stated that it had received from Stonington neither the documentation concerning change orders and supporting of Stonington's claims nor a properly filed claim against the performance bond. *Id.* at ex. H.

The parties' communications continued, and on August 9, 2007 National Fire responded to a July 13, 2007 letter from Stonington stating that it was reviewing materials submitted by Stonington. In the August 9, 2007 letter, National Fire questioned Stonington's claim for $7,185,563 in fire loss damages and National Fire stated its position that casualty events fall outside the scope of a performance bond. *Id.* at ex. I.

On December 24, 2007, National Fire formally notified Stonington that it was denying the claim because Stonington failed to comply with the performance bond's terms and, even if it had, the claims filed were for damages not recoverable under the bond. In September 2008, Stonington filed this suit against Hodess and National Fire.

In its complaint Stonington alleges that, as surety, National Fire undertook to perform each of Hodess's obligations under the building contract, including:

1. Use its best efforts to perform the project in an expeditious and economical manner consistent with the interests of Stonington;
2. Complete the project at a guaranteed maximum price of $20,095,100;
3. Be responsible for the acts and omissions of its employees, subcontractors, and their agents and employees and other persons or entities performing portions of the work for or on behalf of Hodess or any of its subcontractors;
4. Indemnify Stonington for any losses and expenses arising out of or resulting from

performance of the Work caused by the negligent acts or omissions of Hodess, a subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable;

5. At its own expense correct work failing to conform to the requirements of the contract, before or after substantial completion;
6. Perform all responsibilities of Hodess for the correction of defective work and completion of the work called for or inferable from the contract; and
7. Pay damages caused by delayed performance or non-performance of Hodess.

*See* doc. # 1.

Stonington alleges that Hodess breached the construction contract by causing delays in the project and by performing defective workmanship. The alleged delays include those caused by the fire, defective windows, and sprinkler damage. Stonington alleges that Hodess abandoned the project in August 2006 and that three former Hodess employees performed the work necessary to complete the project. With respect to the defective workmanship claims, Stonington states that in February 2008 the condominium associations brought various deficiencies in Hodess's work to Stonington's attention. *See* doc. # 1 at ¶ 35. Stonington has attempted to invoke the provisions of the bond in order to offset the costs associated with the identified delays and defective workmanship issues. By letter dated July 26, 2010, Stonington informed National Fire that it claims $3,160,300 for defective work and $667,150 for incomplete work.[4] National Fire has denied liability for all amounts, primarily on the ground that Stonington failed to comply with the bond's conditions precedent.

The first three counts of the nine-count complaint concern the conduct of Hodess. Count

---

[4] Stonington has identified defective work in the following categories: HVAC-related, window- and door-related, structural items, electrical items, site items, erosion-related, and credit items. With respect to incomplete work, Stonington seeks coverage in the following areas: HVAC-related, electrical items, house items, site items, landscape items, credit items, and change orders, materials and labor to complete Hodess's work. Doc. # 48 at 3-4.

four alleges that National Fire breached the contract (the bond) by failing to perform in a timely manner with respect to losses incurred as a result of Hodess's delays. Count five alleges that National Fire breached the contract by failing to reimburse unpaid property damage losses caused by the fire. It is Stonington's assertion that the fire was caused by the negligence, carelessness and recklessness of a Hodess subcontractor. Count six seeks a declaratory judgment that, in the event that the condominium associations are successful against Stonington on the defective workmanship claims, National Fire is obligated to correct any defective work and reimburse Stonington for any costs it incurs as a result of Hodess's alleged defective work. Count seven alleges that National Fire has violated CUIPA; count eight alleges that National Fire has violated CUTPA. Lastly, count nine alleges that National Fire has breached the implied covenant of good faith and fair dealing by denying coverage.

## IV. Discussion

National Fire moves for summary judgment on the limited issue whether Stonington complied with the conditions precedent to invoking coverage under the bond.[5] National Fire principally argues that Stonington materially breached the terms of the bond by failing to comply with sections 3.2 and 3.3 of the performance bond and that Stonington's hiring of a replacement contractor, i.e., three former Hodess employees, to complete the contract rendered the bond null and void.

Stonington opposes summary judgment essentially by arguing that Stonington complied with section 3, even if its compliance was imperfect. To the extent that Stonington's compliance

---

[5] National Fire also argues that the nature and extent of the damages claimed by Stonington exceed the bond's coverage. National Fire has not briefed this argument but has reserved the right to raise it later. *See* doc. # 28 at 1 n.1.

with section 3 was less than perfect, Stonington argues that National Fire is estopped from claiming prejudice because National Fire was aware of Hodess's financial instability. Stonington also maintains that the motion for summary judgment is premature because National Fire's obligation on the defective workmanship/warranty claims will only mature if the plaintiffs in the state court action succeed on the defective workmanship claim. Stonington further argues that whether its failure to perfectly comply with section 3 deprived National Fire of an opportunity to mitigate its damages presents a genuine issue of material fact because, under a separate indemnity agreement, National Fire *could* have stepped in at the time Hodess abandoned the project.[6]

The interpretation of a contract is a question of law for the court. *See Heyman v. Commerce Ind. Ins. Co.*, 524 F.2d 1317 (2d Cir. 1975). Courts "look to the standard principles of contract interpretation to determine the rights and obligations of a surety under a bond." *United Fidelity and Guar. Co. v. Braspetro Oil Services Co.*, 369 F.3d 34, 51 (2d Cir. 2004). The intent of the parties to a surety bond should be ascertained by a fair and reasonable construction of the written words, and any language used should be given its common and ordinary meaning. *Goldberg v. Hartford Fire Ins. Co.*, 269 Conn. 550 (Conn. 2004).

---

[6] Stonington cites no authority, nor have I found any, for the proposition that, because National Fire entered into a separate indemnity agreement with Hodess, Stonington is excused from its performance under the bond. The indemnity agreement is dated August 2002, ten months before the bond issued, and sets forth that Hodess shall indemnify National Fire under certain circumstances. The fact that, under the indemnity agreement, National Fire could have taken control from Hodess and completed the project does not relieve Stonington of its express obligations under the bond. Furthermore, there is no evidence in the record that Hodess notified National Fire that Hodess abandoned the project, thereby triggering National Fire's option to take possession of the work under the indemnity agreement. *See* doc. # 37, ex. 1 at ¶ 8. Accordingly, any failure of National Fire to exercise its options under the indemnity agreement does not relieve Stonington of its own failure to comply with the bond's conditions precedent.

"A suretyship is a three-party relationship where the surety, [National Fire], undertakes to perform to an obligee, [Stonington], if the principal, [Hodess], fails to do so." *See Elm Haven Const. Ltd. Partnership v. Neri Const., LLC*, 281 F. Supp. 2d 406 (D. Conn. 2003), *aff'd,* 376 F.3d 96 (2d Cir. 2004). Under Connecticut law, a suretyship has been described as a "contract . . . to guard against loss in the event of the principal debtor's default. . . . [T]he obligation of a surety is an additional assurance to the one entitled to the performance of an act that the act will be performed. . . . [T]he liability of sureties is to be determined by the specific conditions of the bond." *Id*. (quoting *Ames v. Comm'r of Motor Vehicles*, 70 Conn. App. 790, 797 (App. Ct. 2002)). A surety's obligation under a bond only matures if the obligee complies with all conditions precedent. *Id.*

In Connecticut a condition precedent is defined as "a fact or event which the parties intend must exist or take place before there is a right to performance . . . . A condition is only distinguished from a promise in that it creates no right or duty in and of itself but is merely a limiting or modifying factor . . . . If the condition is not fulfilled, the right to enforce the contract does not come into existence." *Gianetti v. HealthNet of Conn.*, 116 Conn. App. 459, 468 (App. Ct. 2009) (quoting *Blitz v. Subklew*, 74 Conn. App. 183, 189 (App. Ct. 2002)). Section 3 of an AIA A312 bond enumerates certain conditions precedent that must be complied with in order to trigger the surety's obligation to perform. *See Braspetro*, 369 F.3d at 51 (holding that paragraph 3 of the AIA A312 bond contains a number of conditions precedent to the surety's obligation under the bond).

In short, suretyship law in Connecticut and elsewhere dictates that compliance with the conditions precedent is necessary in order to invoke the surety's obligation under the

performance bond and failure to do is fatal to the obligee's claim for coverage. I now consider whether Stonington complied with section 3 of the bond.

A. *Compliance with Section 3 of the AIA A312 Bond*

The performance bond provides that, if there is no Owner default, in the event of a Contractor default, the Surety's obligations shall arise after the following conditions precedent occur:

> 3.1: The Owner has notified the Contractor and the Surety at its address described in Paragraph 10 below that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and
>
> 3.2: The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Section 3.1; and
>
> 3.3: The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

The bond also incorporates by reference all of the terms and conditions of the underlying construction contract documents – the AIA 121 and AIA A201 – and therefore compliance with section three requires compliance with the terms of the underlying contract documents as well. Doc. 1, ex. B (Section 1: "The Contractor and the Surety, jointly and severally bind themselves . . . and [their] assigns to the Owner for the performance of the Construction Contract, which is

incorporated herein by reference.”).

There is no real dispute that Stonington complied with section 3.1. *See* doc. # 28 at 11; doc. # 31 at ¶ 9. With respect to section 3.2’s dual requirements – Stonington must declare a contractor default, and it must formally terminate Hodess’s right to complete the contract – National Fire argues that, because Stonington failed to comply with both requirements, National Fire is relieved of its obligation to perform under the bond. National Fire also contends that Stonington did not agree to pay the balance of the contract price as required by section 3.3 of the bond.

1. Failure to Properly Terminate Contract is a Material Breach

Stonington complied with the initial requirement that it wait at least twenty days after the March 13, 2006 section 3.1 meeting to terminate Hodess and declare a contractor default. The critical question is whether Stonington properly declared a contractor default and properly terminated the underlying construction contract as required by section 3.2. No specific termination procedure is set forth in the bond, but the bond incorporates the construction contract by reference. *See General Ins. Co. of America v. K. Capolino Const. Corp.,* 903 F. Supp. 623, 627 (S.D.N.Y. 1995). Section 14.2 of the AIA A201 states that termination by the owner may occur if the contractor: (1) persistently or repeatedly refuses or fails to supply enough properly skilled workers or proper materials; (2) fails to make payments to subcontractors; (3) persistently disregards laws; or (4) is otherwise guilty of a substantial breach of a provision of the contract documents. Although Stonington does not specifically state in its November 2, 2006 letter which of the reasons served as a basis for termination, Hodess’s abandonment of the project likely complies with option 4. Section 14.2.2 of the AIA A201 then requires that “[w]hen any of the

above reasons exist, the Owner upon certification by the Architect that sufficient cause exists to justify such an action, may without prejudice to any other rights or remedies of the Owner and after giving the Contractor and the Contractor's surety, if any, seven days written notice, terminate employment of the Contractor . . . ."

Accordingly, reading section 3.2 in conjunction with section 14.2.2, the obligations of Stonington are clear and unambiguous. In order to properly terminate Hodess, at the time Hodess abandoned the project ("when reason existed"), Stonington must first have obtained written certification from the Architect[7] that sufficient cause existed to justify termination. Next, Stonington had to provide Hodess and National Fire seven days' written notice that cause existed to justify termination. At the close of seven days, Stonington could then terminate Hodess.

National Fire does not dispute that Hodess's abandonment of the contract is a breach of the duty to perform and is conduct that supported Stonington declaring a default and terminating Hodess's right to complete. National Fire argues that the fact that Hodess breached does not excuse Stonington's compliance under the contract. National Fire also contends that Stonington's termination letter of November 2, 2006 does not properly satisfy section 3.2 or section 14.2.2 because Stonington waited over two months after Hodess abandoned the project to declare a default and effect termination. National Fire further contends that, even if Hodess's abandonment of the project waived any notice of termination rights that Hodess had, it did not waive the surety's rights under the terms of section 14.2.2 as incorporated by reference into the bond.

---

[7] The Architect is charged with administering the Construction Contract. Section 4.2 of AIA A201.

With respect to whether Stonington properly terminated Hodess in the manner required by the bond and underlying construction contract, the record at summary judgment contains the following facts. At an unspecified time in August 2006, Hodess left the project. Doc. # 35 at 7 (Plaintiff's Mem. in Opposition to Def.'s Motion for Sum. Judg.); *see also* doc. # 38 at ¶¶ 11-12. Stonington then hired three former Hodess employees to complete the project.[8] *Id.* Only after Stonington undertook efforts to complete the project and the project was deemed "completed" did Stonington seek coverage from National Fire. In the November 2, 2006, Stonington stated that it was formally terminating the contract and declaring a contractor default pursuant to section 3.2. Doc. # 31, ex. D. The letter enumerated a number of bases for the termination. *Id.* Seven days later, on November 9, 2006, Stonington wrote to National Fire's counsel that Stonington considered National Fire obligated to complete Hodess's contractual obligations, including warranty work. Doc. # 31, ex. E. Stonington also attached one such request for warranty work that it had already engaged in efforts to address. *Id.*

On this record, the date of Hodess's abandonment of the project is the date when reason to terminate became apparent. There is no evidence that Stonington first complied with section 14.2.2 by obtaining certification from the Architect that cause for termination existed. Nor is there any evidence in the record that Stonington undertook the steps required by the construction contract to formally terminate Hodess at the time reason for termination arose. Put another way,

[8] The contract defines completion in two stages. Substantial completion is defined as "the stage in the progress of the Work when the Work or designation portion is sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work for its intended use. Including the issuance of the Certificate of Occupancy for that Portion of the Work." Section 9.8.1 of AIA A201 as amended by Amendment No. 4. Final completion occurs when the Architect find the Work acceptable under the Contract Documents and finds that the Contract has been fully performed. *Id*. at section 9.10.

there is no evidence that, when Hodess abandoned the project in August 2006 that Stonington notified Hodess and National Fire that cause to terminate had arisen and that it was terminating Hodess's right to perform, and thereby giving National Fire seven days' notice of its obligation to step into Hodess's shoes.

Stonington maintains that, in light of the circumstances surrounding Hodess's abandonment, National Fire's expectation that Stonington would undertake formal termination is unrealistic. National Fire was also the surety on a payment bond taken out by Hodess on the project. National Fire had been paying Hodess's subcontractors on the project because Hodess had declared itself unable to pay. *See generally* doc. # 37, exs. 2-11. Because National Fire was aware of Hodess's inability to pay its subcontractors, Stonington argues that National Fire is barred from claiming it was prejudiced by Stonington's failure to perfectly comply with termination and notice requirements of the construction contract and the bond. In sum, Stonington argues that National Fire, wholly aware of the financial situation of Hodess and the likely impact on the project, should not be able to come into court after idly sitting by and avoid liability under the bond when National Fire cannot demonstrate any prejudice from Stonington's lack of strict compliance.

Stonington also argues that it should not be barred from recovery on the performance bond merely because it failed to go through the "sham" of declaring the abandoning contractor in default and providing National Fire with seven days' written notice prior to formal termination of the abandoning contractor. National Fire's interpretation of the bond's terms, Stonington maintains, construes the terms of the bond too narrowly and in a way inapplicable to the circumstances. Stonington recognizes that compliance with the bond and contract provisions

governing terminations was not impossible, but argues that it was impracticable and that National Fire's situation would not be any different with respect to the claims in the complaint had Stonington complied with sections 3.2 and 14.2.2. Stonington also argues that compliance with section 3 is waived with respect a claim for delay damages. *See International Fidelity Ins. Co. v. County of Rockland*, 98 F. Supp. 2d 400, 433 (S.D.N.Y. 2000) (concluding that, under New York law, an obligee need only substantially comply with conditions precedent in order to invoke coverage for delay damages under performance bond).

Stonington's arguments are not persuasive. In Connecticut, a material failure of performance by one contracting party relieves the other party from any further performance under the contract. *See O&G Industries v. National R.R. Passenger Corp.*, 537 F.3d 153 (2d Cir. 2008). This principle extends to suretyships. *See Elm Haven Const.*, 281 F. Supp. 2d 406. Connecticut courts have stated that "when a particular form of notice, or length of time, is stipulated to in the contract, exact compliance is necessary, and giving the prescribed notice is an essential prerequisite to termination of the contract." *See Bouchard v. Boyer*, 1999 WL 335845 (citing 1 S. Stein, Construction Law (Matthew Bender 1998) § 4.13[1][c]); *see also* Construction Law, 13 Conn. Prac. § 1:19 ("Failure to provide notice to the contractor, however, may invalidate the termination and result in a material breach of the contract by the owner.").

Although Stonington argues that National Fire had notice of the problems concerning Hodess's performance, that fact does not equate to providing the surety with actual notice of default. *See Elm Haven Const.,* 281 F. Supp. 2d at 413; *Balfour*, 986 F. Supp. at 84 n.4, n5. The court in *Elm Haven Const.* held that, "absent a sufficiently clear, direct, and unequivocal or precise declaration of default, no such declaration will be found to have occurred." *Elm Haven*

*Const.,* 281 F. Supp. 2d at 413 (internal quotations omitted). That decision further held that communications in which the obligees only described a partial default and conveyed a desire to allow the contractor to finish the remaining work did not give rise to notice of a contractor default. *Id.* In *Elm Haven Const.*, as here, the obligee subsequently gave notice of the default and termination to the surety but only after the obligee had hired another to complete the contract. The court held that such conduct precluded the surety from exercising its rights under the performance bond – conduct that renders the performance bond null and void. *Id.*

The holding of *Elm Haven Const.* squarely applies here. The court held that, although the surety could have acted more diligently in investigating issues concerning the contractor, the burden lay with the obligee to protect its interests by complying with the terms of the bond and the construction contract. *Id.* Here, National Fire could have acted more diligently to determine Hodess's inability to pay its subcontractors and any impact that had on the project. National Fire's failure to act, however, does not excuse Stonington's delay in declaring a contractor default or in fully complying with the requirements for doing so. *See also Braspetro,* 369 F.3d at 51 (holding that communications from obligee to surety about subcontractor's performance were insufficient to trigger surety's liability where the general contractor failed to declare subcontractor in default as required by the terms of the performance bond); *Balfour Beatty Const.,* 986 F. Supp. 82 ("Performance bond requirements for notice of default and demand that surety step in and perform under the bond must be met before an obligee can recover damages under the performance bond."); *see also Dragon Const., Inc. v. Parkway Bank & Trust*, 287 Ill. App. 3d 29 (App. Ct. 1997) (finding a material breach where obligee did not follow the specific termination and notification procedures provided in the construction contract; hiring of successor

contractor without the surety's knowledge voided bond and excused surety's performance); *L&A Contracting v. S. Concrete Svc., Inc.,* 17 F.3d 106 (5th Cir. 1994) (holding that clear declaration of default is precondition to surety's liability under performance bond).

Stonington's failure to terminate Hodess when reason to do so arose and then to properly comply with the notice procedures set forth in section 14.2.2 is a material breach of the bond and underlying contract. Furthermore, Stonington's failure to notify National Fire that Hodess abandoned the project and Stonington's unilateral decision to hire successor contractors to complete the project deprived National Fire of the opportunity to mitigate its damages and represent material breaches of the bond. *See Dragon*, 287 Ill. App. 3d at 58. In *Dragon,* as here, the obligee failed to perform under both the performance bond's conditions precedent and the construction contract's seven days' written notice requirement. The court observed that "[a]n obvious reason for this requirement was to allow [the surety] to exercise its right under the performance bond to participate in the selection of a successor contractor." *Id.* The analysis applies directly to the facts here. Not only did Stonington fail to properly terminate the Hodess contract and notify National Fire of the termination, it deprived National Fire of any opportunity to participate in the selection of a successor contractor. By conducting itself in this fashion, Stonington dissipated the balance of the contract price through payments to the replacement contractors and deprived National Fire of an opportunity to step into Hodess's shoes and to exercise any rights National Fire had under the performance bond, including selection of a completion contractor. By choosing this path, rather than complying with the terms of the construction contract, Stonington materially breached both the construction contract and the performance bond. *See Enterprise Capital Inc. v. San-Gra Corp.*, 284 F. Supp. 2d 166 (D. Mass.

2003) (holding that owner materially breached the construction contract by failing to comply with the contract's notice provisions before terminating the general contractor and hiring a replacement; the surety was therefore relieved of its obligations under the performance bond).

2. Depleting Contract Balance as Material Breach

National Fire further argues that, even if Stonington complied with section 3.2, it has failed to comply with section 3.3's requirement that Stonington agree to pay the balance of the contract price "in accordance with the terms of the construction contract." The balance of the contract price is defined as "the total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made, including allowance to the Contractor of any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract." Doc. # 1, ex. B. During the hearing on the motion, I directed Stonington to supplement the record with evidence, if available, that it had complied with section 3.3 of the performance bond and to specify the warranty claims it was making under the performance bond. By letter dated July 26, 2010, Stonington stated that, although it has paid out the entire contract balance, Stonington had conveyed to National Fire as required by section 3.3 of the bond that it would pay the balance of the contract price. Doc. # 48.

Section 3.3 provides, in pertinent part, that "[t]he Owner has agreed to pay the Balance of the Contract Price to the Surety *in accordance with the terms of the Construction Contract* . . . ." (emphasis added). Reading section 3.3 in conjunction with the construction contract indicates that a mere promise to pay the balance of the contract price is insufficient to comply with section

3.3 where the Owner has already materially breached the construction contract by depleting the balance of the contract price.

In *Braspetro* the Second Circuit affirmed the district court's interpretation that the "balance of the contract price" is properly reduced without breaching the bond's terms where payments are made in accordance with the construction contract's specified payment schedule. 369 F.3d at 59-60; *see also U.S. Fidelity and Guar. Co. v. Braspetro Oil Services Co.*, 219 F. Supp. 2d 403, 450 (S.D.N.Y. 2002). Here, payment at completion is governed by section 9.8 of AIA A201. Section 9.8 states that, once the Contractor and the Owner agree that the project is substantially complete, the Contractor shall prepare a list of items to be completed or corrected prior to final payment. The list shall be submitted to the Architect. Once the Architect agrees that the project is substantially complete, the Architect shall prepare the Certificate of Substantial Completion. The Certificate shall establish the date of substantial completion, the responsibilities of the Owner and Contractor for security, maintenance, heat, utilities, damages to the Work and insurance, and shall fix the time within which the Contractor shall finish all of the items left incomplete or in need of correction. Any warranties required under the Contract shall commence on the date of substantial completion.

The contract then requires that the Certificate of Substantial Completion be submitted to Stonington and Hodess for their written acceptance of the responsibilities assigned to them in such Certificate. At that point *"[u]pon such acceptance and consent of surety*, if any, the Owner shall make payment of retainage applying to such Work or designated portion thereof. Such payment shall be adjusted for Work that is incomplete or not in accordance with the requirements of the Contract Documents." Section 9.8.5 of AIA A201 (emphasis added).

There is no dispute that Stonington deemed the project complete and therefore paid out the entire contract balance. Indeed, in an effort to comply with section 3.3 of the bond, Stonington has repeatedly represented that there is no remaining contract balance. Reducing the balance of the contract price to zero by making payments not specifically required by the construction contract effectively invalidates Stonington's agreement to pay the balance of the contract price. Indeed, by failing to comply with the payment schedule specified in the construction contract, Stonington is left with no balance of the contract price that it can agree to pay to National Fire. The present circumstance is quite distinguishable from that in *Braspetro,* where the balance of the contract price was reduced to zero by payments explicitly permitted under the underlying contracts. 369 F.3d at 59-60.

Generally, "[t]he surety has a priority right to the unpaid balance of the contact funds[,] which it may use to complete performance of the bonded contract. . . . The surety's right to such unpaid contract funds has priority over a bank holding an assignment from the contractor[;] . . . over a lending institution [that] has properly filed a security interest[;] . . . [and even] over the trustee in bankruptcy for the contractor, at least to the extent of the surety's loss on th[e] contract." *Braspetro,* 369 F.3d at 59 (quoting 5 Construction Law ¶ 17.09[2], at 17-114 (Steven G.M. Stein, et al. eds., 2004)). Although Hodess may well have waived its rights under section 9.8 when it abandoned the project, nothing in the record indicates that National Fire waived its rights to consent to the release of payments at the time Stonington declared the project complete.

Stonington's disbursement of the entire contract balance without consideration of National Fire's right to determine if the funds should be released breached the terms of the construction contract. By depleting the contract balance after Hodess abandoned the project but

before calling upon National Fire to perform under the bond, Stonington materially breached section 9.8 and deprived National Fire of an opportunity to exercise its rights under section 4 of the bond. Because Stonington depleted the contract balance in derogation of the terms of the contract, it does not matter that it has now, four years later, agreed to "pay" the zero contract balance to National Fire.

**V. Conclusion**

Section 3 of an AIA A312 bond sets forth the conditions precedent that must be complied with in order to trigger the surety's obligation to perform. *See Braspetro*, 369 F.3d at 51. Connecticut courts have stated that if a condition is not fulfilled, "the right to enforce the contract does not come into existence." *Gianetti,* 116 Conn. App.at 468. Stonington's failure to terminate Hodess when reason arose, its failure to properly effect the termination as set forth in section 14.2.2 of the construction contract, the hiring of successor contractors without the consent of the surety, and the disbursement of the entire contract balance without the express approval and consent of National Fire materially breached the terms of the performance bond and the underlying construction contract. Accordingly, National Fire is entitled to summary judgment on counts four, five, six, seven, eight, and nine of the complaint, and is dismissed from the case.

It is so ordered this 9th day of March 2011 at Bridgeport, Connecticut.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge